IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CARY MOORE MENZIE,
    Plaintiff,

vs.                                          Case No.: 3:14cv370/LAC/EMT

CAROLYN W. COLVIN,
Commissioner of the
Social Security Administration,
    Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. §§ 401, *et seq*. It is now before the court pursuant to sections 405(g) and 1383(c)(3) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) and supplemental security income benefits (SSI) under the Act.

        Upon review of the record, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; therefore, the decision of the Commissioner should be reversed and remanded.

I.        PROCEDURAL HISTORY

        This suit involves two applications made under the Act. The first is an application for DIB under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Tr. 146–47).[1] The second is an application for SSI benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. 148–54).

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on October 31, 2014 (Doc. 5).

Plaintiff applied for DIB benefits on August 13, 2010 (Tr. 146–47), and then for SSI benefits on October 27, 2010 (Tr. 148–54). In both applications Plaintiff alleged disability starting on September 19, 2007 (Tr. 146, 148). Her applications were denied initially and on reconsideration (Tr. 21–23). On November 21, 2012, following a hearing held on July 6, 2012, an administrative law judge (ALJ) rendered a decision finding that Plaintiff was not disabled as defined under the Act (Tr. 24–36). Plaintiff requested review of the ALJ's decision, which request the Appeals Council denied on June 13, 2014 (Tr. 1–7). The ALJ's decision thus stands as the final decision of the Commissioner, and is properly subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

II.   FINDINGS OF THE ALJ

The ALJ made the following findings relative to the issues raised in this appeal (Tr. 24–36):

1).  The claimant meets the insured status requirements of the Act through December 31, 2011.[2]

2)   The claimant has not engaged in substantial gainful activity since September 19, 2007, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

3)   The claimant has the following severe impairments: major depressive disorder, polysubstance abuse, bipolar disorder, post traumatic stress disorder (PTSD), anxiety disorder not otherwise specified, polysubstance abuse, and narcolepsy (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4)   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5)   The claimant possesses the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. She cannot climb ladders, ropes, or scaffolds and must avoid all exposure to unprotected heights and dangerous machinery. The claimant cannot operate motor vehicles. She

---

[2] Thus, the time frame relevant to this appeal is September 19, 2007 (alleged onset) to December 11, 2011 (date last insured), for purposes of Plaintiff's claim for DIB. The time frame most relevant to Plaintiff's claim for SSI is October 27, 2010 (the date she applied for SSI) through November 21, 2012 (the date the ALJ issued his decision). *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

      can tolerate non-transactional interaction with the public and perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes. The claimant is able to sustain concentration and attention for two-hour periods with customary breaks.

6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7)     The claimant was born November 10, 1977, and was 29 years old—which is defined as a younger individual aged 18 through 49—on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11)    The claimant has not been under a disability, as defined in the Act, at any time during the period beginning September 19, 2007, and continuing through November 21, 2012, the date of the ALJ's decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

III.    STANDARD OF REVIEW

      Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("This Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214

(11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d 1436, 1439 (11th Cir. 1997); Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416). Therefore, citations in the remainder of this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV. RELEVANT HEARING TESTIMONY & MEDICAL/PSYCHOLOGICAL HISTORY

A. Relevant Hearing Testimony

Plaintiff testified at her hearing before the ALJ that she was born on November 10, 1977, and was thus thirty-four years old at the time of the hearing (Tr. 47). She testified that her last employment, at Barnes & Noble bookstore during May of 2012, lasted one day (*id*.). Before that, Plaintiff worked as a telemarketer, and before that, in 2010, she was a salesperson at an Ann Taylor store (Tr. 48). Before that, she worked for cellphone companies, a tanning salon, a doctor's office, a computer company, a communications company, and a university bookstore (Tr. 49–51).

Plaintiff stated that she was forced to leave her job at Ann Taylor because she was a victim of discrimination on account of her bipolar disorder (Tr. 54). Plaintiff also testified that she was unsuccessful at holding her job at Barnes & Noble because she was "completely inconsistent" and could not control her moods (Tr. 55). Plaintiff further stated, "I'm unable to work because I have no control over my emotions and that basically renders me severely depressed most of the time and unable to get out of bed, and unable to sustain any kind of consistency in my personal and my

professional life" (Tr. 51–52). Plaintiff added that she suffers from narcolepsy, for which she was prescribed Ritalin (Tr. 52). While taking the Ritalin, she was generally able to work a normal workday, although she might have fallen asleep if under stress or more depressed than usual (*id*.). Plaintiff stated that, since she lost her last job at Barnes & Noble, her condition has worsened as she has become more "socially isolated" with feelings of hopelessness, and she has developed a panic disorder which causes her stress and anxiety whenever she tries to take on responsibility or when she has to be around other people (Tr. 55).

      B.      Relevant Medical/Psychological History

The ALJ noted that, although Plaintiff stated she was disabled since September 19, 2007, there were no available medical records before September 12, 2008, when she sought medical services at the Lakeview Center (Tr. 27). Plaintiff reported that, prior to that time, she had been prescribed medication such as Ritalin and benzodiazepines from her primary physician in Tennessee, but after she moved away the physician discontinued these medications (*id*.). Plaintiff identified in medical history reports that she has been receiving psychiatric care since the age of eighteen but has no history of psychiatric hospitalizations (Tr. 353).

After her initial visit on September 12, 2008, at Plaintiff's next appointment on October 10, 2008, a psychiatric evaluation was performed by Yira Van Der Linde, M.D., who determined that Plaintiff had "major depressive disorder, recurrent, non-psychotic; posttraumatic stress disorder; alcohol abuse, in reported remission; cannabis abuse, in reported remission, unconfirmed; and personality disorder, not otherwise specified, with borderline traits" (Tr. 28, 325). Plaintiff reported to Dr. Linde that she was having feelings of depression and anxiety, with a "dooming sensation" and feeling like she wanted to sleep most of the time (Tr. 325). Plaintiff classified herself as mildly anxious and mildly depressed and denied that she had any suicidal or homicidal ideation (*id*.). Dr. Linde discussed with Plaintiff the proper titration of her Effexor medication and advised her not to tamper with the medication capsules, which she was having difficulty swallowing (*id*.).

On December 5, 2008, Plaintiff was brought in for a follow-up appointment by her boyfriend, with Plaintiff reporting that she was not doing well (Tr. 323). Plaintiff reported that she had not left the house since Thanksgiving Day, and her boyfriend confirmed that she was mostly staying in bed and not interacting (*id*.). Plaintiff admitted she was still breaking up her Effexor

capsules and not taking them consistently (*id*.). Dr. Linde discussed her medication history, and while Plaintiff stated that when she was on a higher dose of Ritalin she was "energized," Dr. Linde indicated that Ritalin was "not necessarily what we were looking for in treating her depression" (*id*.). Plaintiff was now reporting her depression as "extreme," though her anxiety remained "mild" (*id*.).

Plaintiff's boyfriend again brought her to her next visit on January 23, 2009, and he expressed concern over her lack of activity (Tr. 320). Dr. Linde noted that she had "definitely come off the Effexor but has begun to develop panic disorders and panic attacks and because of that is fearful leaving the house" (*id*.). Plaintiff reported that her depression had not been as bad as before but that her anxiety had continued (*id*.). She again requested an increased dose of Ritalin, but she was counseled against it because, as her boyfriend agreed, it made "her body go on overdrive" (*id*.). Dr. Linde also expressed concern regarding her Lithium intake and added Celexa to her medication regimen to help with her anxiety (*id*.).

On January 30, 2009, Plaintiff sought and received a psychiatric evaluation from Douglas H. Fraser, M.D. (Tr. 353–55). Dr. Fraser identified Plaintiff as having bipolar II disorder in partial remission, with treatment being provided for depression, anxiety, narcolepsy, and hypothyroidism (Tr. 353). Plaintiff reported that her depression and anxiety had started to reduce and that she had no panic attacks since she started taking Celexa one week prior to the appointment (*id*.). Plaintiff was concerned that, since her dosage of Ritalin was lowered, she had gained 35 pounds (*id*.). Dr. Fraser continued her on the same medication regimen initiated by Dr. Linde, except that Dr. Fraser increased her Ritalin dosage (Tr. 354). As Dr. Linde had found before, Dr. Fraser found Plaintiff to be fully alert, healthy, groomed, and cooperative during the examination (*id*.). Whereas Dr. Linde had assessed Plaintiff's Modified Global Assessment of Functioning (MGAF) at 55, Dr. Fraser placed it at 60, both of which are in the moderate range (*id*.).

Plaintiff had a series of follow-up visits with Dr. Fraser, during which Plaintiff's condition would vary, depending on factors such as adjustments in her medication and life events. On February 6, 2009, Plaintiff reported her condition as improved (Tr. 352). On March 12, 2009, she reported experiencing severe panic attacks and depression; her Xanax dosage was increased, her Celexa was decreased, and she was started on Ambien (Tr. 351). On March 19, 2009, she reported

that her panic attacks had stopped and the Ambien was working well, but that she had no energy (Tr. 350). On April 10, 2009, her symptoms had worsened, and her Celexa dosage was increased; Plaintiff also reported that she was going to be married to her boyfriend on May 2, that he had been accepted into graduate school, and that their dog had died (Tr. 349). On April 24, 2009, Plaintiff reported that her Celexa had helped some and that her wedding had been put off (Tr. 348). On May 22, 2009, she reported that she had been waking up in a panic, had increased anxiety, and that the Ambien was not working effectively. Plaintiff also stated that there was stress over money, and that she had filed or would file for bankruptcy (Tr. 347). On June 19, 2009, Plaintiff reported that she had improved, was doing well with less anxiety, and had obtained a job with Lowe's (Tr. 346). On August 24, 2009, Plaintiff reported that her boyfriend had left her, that she had no job, that her credit cards had reached their maximum, and that she was again experiencing anxiety upon awakening (Tr. 345). On September 18, 2009, Plaintiff expressed anxiety over starting a new job and still experienced an "irrational panic" upon awakening in the morning, though she slept well (Tr. 344). On November 19, 2009, Plaintiff reported having a panic attack for which she went to the Emergency Room on November 4, 2009, and she reported an increase in depression (Tr. 343).[4] On December 3, 2009, Plaintiff stated that she had moved in with a new boyfriend and was feeling better (Tr. 342). On December 30, 2009, Plaintiff stated that she was doing well (Tr. 341). On March 24, 2010, Plaintiff reported that she had some depression, but on April 21, 2010, she stated that her energy was better and that her part-time job was going well (Tr. 339–40). On May 28, 2010, Plaintiff stated she was not doing well, was experiencing depression and anxiety, and was falling asleep. She stated that she had changed to a generic brand of Ritalin, and she also reported she had obtained a new job at JDJ Marketing Research (Tr. 338). On July 8, 2010, Plaintiff reported no difficulties, but on August 12, 2010, she reported she was having a "bad month" and that she had been turned down for three jobs, but that her medications were helping (Tr. 410–11). On August 28, 2010, she reported nausea and fatigue, and on September 9, 2010, she reported severe anxiety

---

[4] Medical records show that Plaintiff went to the Emergency Room at Baptist Hospital on November 4, 2009, complaining of an acute panic attack and elevated anxiety, although alcohol abuse was also suspected (Tr. 546–57). Plaintiff reported she had run out of her Xanax prescription, and after she stabilized she was discharged with a prescription for Xanx and Celexa (Tr. 549–50).

as well as malaise, fatigue, and low energy (Tr. 407, 409).  On October 7, 2010, Plaintiff reported lethargy and weight gain (Tr. 406).  On October 21, 2010, she reported being more energetic, walking every day, and doing well (Tr. 405).  On November 18, 2010, however, she was not doing well, feeling "awful" and depressed, and staying in bed (Tr. 404).  On November 24, 2010, she was "doing allright" but was having problems with her boyfriend (Tr. 403).  On December 21, 2010, Plaintiff reported she felt well so long as she took her medications but that she was not exercising and was gaining weight (Tr. 402).  She also stated that she had lost her job, which she called a wrongful, discriminatory termination for which she evidently was seeking legal relief (*id*.).  On January 20, 2011, and on February 17, 2011, she reported feeling well, though she mentioned that her boyfriend had a drinking problem (Tr. 400–01).

Plaintiff also presented to Shannon Wright-Johnson, Ph.D., for psychological evaluation and treatment, beginning on November 24, 2009, and lasting through April of 2012 (Tr. 474–95, 389–99, 496–545).  In observing the wide variance in Plaintiff's emotional states from visit to visit, Dr. Wright-Johnson's treatment notes chart a course similar to those of Dr. Fraser.

Throughout her time under Dr. Wright-Johnson's care, Plaintiff frequently reported having increased depression (Tr. 493, 502, 503, 510. 511. 516, 527, 542) and difficulty getting or staying out of bed (Tr. 393, 493, 504, 511, 519, 526, 533), sometimes to the point that she would stay in bed for days at a time (Tr. 493, 519, 533, 534).  Plaintiff also frequently described feeling anxious or stressed (Tr. 396, 486, 487, 402, 527, 535, 540, 542, 543) and would occasionally report having panic attacks (Tr. 487, 537) and suicidal thoughts (Tr. 408).  Plaintiff also stated at times that she was not eating or bathing (Tr. 395, 396, 510, 511) and that she had missed business or therapy appointments (Tr. 519, 526).  Plaintiff indicated that her symptoms were brought on by such things as job loss or financial problems (Tr. 486, 542), relationship issues (Tr. 489, 527, 539, 545), or legal troubles (Tr. 533, 539, 540).

On the other hand, there were numerous instances where Plaintiff stated she was feeling well, energetic, and positive (Tr. 389, 391, 392, 398, 491, 507, 512, 520, 529, 530).  Emblematic of this positivity were Plaintiff's frequent reports that she was making forays into a new job or vocation (Tr. 397, 496, 507, 509, 514, 518, 523, 525, 536), was quitting smoking or starting a new exercise regimen (Tr. 399, 530, 531), or had made a new friend (Tr. 535).

As is evident from these records, Plaintiff's emotional condition would often fluctuate greatly from one week to the next. Plaintiff seemed aware of this as several times she discussed with Dr. Wright-Johnson her need to recognize and manage her tendency to swing from one extreme to the other (*see, e.g.*, Tr. 399). Plaintiff nearly always appeared for her appointments well groomed, communicative, and normally attentive and able to concentrate. During this period of treatment, Dr. Wright-Johnson assigned Plaintiff GAF scores in the 60 to 68 range (Tr. 475, 478, 481, 485, 487).

On July 3, 2012, Dr. Fraser completed a Supplemental Questionnaire as to Residual Functional Capacity for Plaintiff (Tr. 469–70). While he evaluated Plaintiff's psychiatric impairments as causing only slight restrictions on her daily living activities, he rated her "estimated deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in a work setting or elsewhere)" as "constant" (Tr. 469). Asked about the degree to which Plaintiff would experience episodes of deterioration or decompensation in a work setting which would cause exacerbation of her psychiatric symptoms or cause her to withdraw, Dr. Fraser answered that the degree would be "extreme" (*id.*). Dr. Fraser also identified the limitations on Plaintiff's ability to understand and carry out instructions as "extreme," and he stated that she would have a "marked" limitation on her ability to respond appropriately to supervision and to co-workers and to perform simple or repetitive tasks (Tr. 469–70). Dr. Fraser concluded that Plaintiff was disabled from a psychiatric perspective (Tr. 470).

On June 28, 2012, Dr. Wright-Johnson completed the same Questionnaire for Plaintiff (Tr. 472–73). Dr. Wright-Johnson found that Plaintiff's deficiencies in concentration, persistence, and pace in a work setting would be "frequent" and that her episodes of deterioration or decompensation would be "extreme" (Tr. 472). Dr. Wright-Johnson also indicated that Plaintiff's limitations in understanding and carrying out instructions would be "extreme," and that the limitations on her ability to respond to supervision and co-workers would be "moderate" (Tr. 472). Dr. Wright-Johnson provided that Plaintiff would have a "marked" limitation on her ability to perform simple or repetitive tasks (Tr. 472–73). Dr. Wright-Johnson then provided the following commentary:

> Mrs. Cary Moore Menzie was in psychotherapy treatment with me from 11-24-09 until 04/25/2012. During that time, I observed her experiencing chronic, debilitative, depressive episodes. The severity of the depression resulted in her exhibiting poor self-care (going days—up to a week—without showering or changing clothes), low

energy, no motivation and hypersomnia. Oftentimes she would remain in bed. Although she is articulate, smart and has many positive skill sets, I do not believe that she could reasonably sustain employment. She does not handle stress well and decompensates quickly. I have seen her make strides to pursue an employment idea only to become overwhelmed and experience moderate to severe depression.

(Tr. 473).

On March 22, 2011, a Mental Residual Functional Capacity (RFC) Assessment was performed by Alan Harris, Ph.D. (Tr. 418–34). Dr. Harris listed Plaintiff as moderately limited in her ability to maintain concentration for extended periods, perform scheduled work activities with regular attendance and punctuality, and perform a normal workday or workweek at a consistent pace without unreasonable interruption (Tr. 418–19). He also noted moderate difficulty in getting along with coworkers and responding appropriately to changes in the work setting (Tr. 419). Dr. Harris specifically noted that "at times" Plaintiff would have difficulty maintaining concentration, persistence and pace while performing extended or complex tasks (Tr. 420). Dr. Harris concluded that Plaintiff was able to perform "SRR tasks" (*id.*).

On January 24, 2011, Richard K. Lyon, Ph.D., also performed a psychiatric RFC assessment for Plaintiff (Tr. 375–88). Based on Plaintiff's treatment notes, which Dr. Harris found "fairly sketchy with little information to truly clarify," he evaluated Plaintiff as mildly limited in her ability to maintain activities of daily living, social functioning, and concentration, persistence and pace (Tr. 385). Dr. Lyon indicated that Plaintiff would have no episodes of decompensation of extended duration (*id.*). He saw Plaintiff's "function data" as "generally consistent over time" and therefore considered it credible (Tr. 387). Dr. Lyon also saw the diagnoses for Plaintiff as credible. While he noted Plaintiff to have variable mood stability despite taking medication, he viewed her medications as helpful (*id.*). He stated that Plaintiff was able to engage in a "wide range of behaviors necessary for successful daily living and reasonable social and vocational functioning although the evidence does indicate mild and occasional problems across all functional domains" (*id.*). Dr. Lyon concluded that Plaintiff's limitations did not "meet or equal any listings" and were "not severe for purposes of [substantial gainful activity]" (*id.*).

On January 19, 2011, Plaintiff was seen by Steve Hirschorn, PhD, for a clinical evaluation (Tr. 371–79). While Dr. Hirschorn observed that Plaintiff was well groomed and alert on the day

of the interview—as seems to generally be the case when Plaintiff appears for an appointment—he acknowledged her emotional swings and the fact that "her demeanor today is not representative of how she typically reacts" (Tr. 373). Dr. Hirschorn noted that when Plaintiff is depressed she feels "absolutely horrible," her memory and concentration are impaired, and she "feels very hopeless with no energy, enjoyment, motivation, or self esteem" and "does not get out of bed for five to six days" (Tr. 372). Conversely, Plaintiff would also experience "manic periods, perhaps two weeks out of four in which she is extremely motivated to do as much as possible, euphoric, with rapid speech, fast moving thoughts, grandiosity, and irresponsibility" (Tr. 371). Plaintiff also reported anxiety attacks that are usually brought on by a thought or situation and can last for hours (Tr. 372). When Plaintiff was working, she would try to "will herself to work" despite her spells of depression because work would be "some source of enjoyment and productivity" for her (Tr. 373). Although her medications have been somewhat successful, Plaintiff stated that "she is more depressed now than ever before" (*id*.). Dr. Hirschorn gave Plaintiff a GAF score in the 45–55 range (*id*.).

On March 11, 2011, a case analysis was performed by Thomas Renny, D.O., who summarily affirmed the physical RFC assessment initially conducted on Plaintiff on February 1, 2011 (Tr. 416, 62–69).

On November 23, 2010, a vocational evaluation was conducted by Mark Laufer, a Board Certified Disability Analyst (Tr. 183–90). From a "physical capacities standpoint," Mr. Laufer found Plaintiff to be generally capable of full-time work (Tr. 183). However, "[w]hen her psychiatric disabilities are factored into her work tolerance and stamina Ms. Moore does not appear to be medically managed and would be unable to work consistently from day to day in competitive employment regardless of the hours worked" (*id*.). Thus, Mr. Laufer found that, while Plaintiff would be able to return to her past work if her symptoms were to become effectively managed, "which may be a very illusive [sic] variable with a diagnosis of Bipolar II Disorder," her present condition rendered it "impossible to maintain a traditional competitive job" (Tr. 184). Mr. Laufer found Plaintiff to be vocationally disabled, and added:

> Ms. Moore will need to establish a track record of long term psychiatric stability before [Vocational Rehabilitation] will be in a position to assist her. At this time she has not achieved this level of stability. This effort may take some time and actually Ms. Moore may never be completely medically managed. She may experience

> monthly cycling during menses which is a common occurrence for females with a Bipolar II diagnosis. If Ms. Moore was able to limit her Bipolar II cycling to once a month there would then be the opportunity to consider home based or self employment options.

(Tr. 184).

V.   DISCUSSION

Plaintiff contends on appeal that the ALJ's decision was not supported by substantial, competent evidence because he failed to give controlling weight to the opinions of Plaintiff's treating sources, Dr. Fraser and Dr. Wright-Johnson.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2). This is because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether a claimant meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(d).

Here, the ALJ gave no substantial weight to Dr. Fraser's opinion on Plaintiff's RFC because, he found, the opinion was not consistent with Dr. Fraser's own treatment notes. The ALJ additionally noted that Dr. Fraser described Plaintiff's restrictions on daily living as slight, which the ALJ found to be at odds with Dr. Fraser's statement that Plaintiff "constantly fails to complete tasks, experiences extreme episodes of withdrawal, and marked limitation in performing simple tasks in a work setting" (Tr. 33). The ALJ also opined that "Fraser's opinion that [Plaintiff] experiences only moderate difficulty in social functioning is inconsistent with his opinion that the claimant has marked limitation in responding appropriately to supervision and co-workers" (*id*.).

Likewise, the ALJ accorded no substantial weight to Dr. Wright-Johnson's RFC assessment, finding that her statement that Plaintiff experienced "chronic, debilitating, depressive episodes" was inconsistent with her treatment notes reflecting that Plaintiff was "generally functioning pretty well" and experiencing no more than mild symptoms of her bipolar disorder, depression, and anxiety (Tr. 32). The ALJ also noted Dr. Wright-Johnson's praise of Plaintiff's endeavors to establish a business on her own and Dr. Wright-Johnson's recognition that Plaintiff's symptoms had improved in response to treatment.

Hence, at the foundation for the ALJ's decision not to assign controlling weight to the opinions of Drs. Fraser and Wright-Johnson was his assessment that their opinions were not consistent with their own treatment notes, which the ALJ characterized as reflecting mild to moderate symptoms. In fact, consistency—or the lack thereof—with these treatment notes also became the fulcrum in the ALJ's decisions whether to give credence to the opinions of the non-treating sources. Thus, for example, the ALJ assigned "little weight" to Dr. Hirschorn's opinion that Plaintiff was moderately to seriously impaired because it was inconsistent with the treatment notes of Drs. Fraser and Wright-Johnson, especially those from January and February of 2011 when Dr. Hirschorn saw Plaintiff (Tr. 31). Likewise, the ALJ accorded "no substantial weight" to the opinion of Dr. Lyon because it conflicted with the other doctors' treatment notes (Tr. 33). Conversely, the ALJ gave "substantial but not significant weight" to the opinion of Dr. Harris because it was "generally consistent" with the treatment notes, and he gave "significant weight" to Dr. Renny's physical residual functional capacity assessment because it was consistent with the treatment evidence (*id.*). Finally, and perhaps most instructively, the ALJ found the opinion of Dr. Laufer to be supportive of the RFC assessment to the extent that it "concluded that, with effective medical management, Plaintiff would be a candidate to return to areas of past training and experience," but to merit little weight to the extent that it found that Plaintiff was not presently a candidate because she had not yet, and perhaps could not ever, achieve symptom stabilization with appropriate medical treatment (*id.*). Thus, as with the other opinions, the basis upon which the ALJ discounted Dr. Laufer's opinion regarding Plaintiff's lack of symptom stabilization was that it was inconsistent with the treatment notes of Drs. Fraser and Wright-Johnson (Tr. 34).

The court finds that the ALJ's assessment of the treatment notes from Drs. Fraser and Wright-Johnson fails to account for the mercurial nature of Plaintiff's alleged disability. This court models its finding on the Eleventh Circuit's opinion in Mace v. Commissioner, Social Sec. Admin., No. 14–11971, 2015 WL 1380168 (11th Cir. Mar. 27, 2105), which under similar factual circumstances vacated a decision of the Commissioner of Social Security denying an application for disability because the ALJ had failed to provide good cause for giving only little weight to the opinion of a treating physician. The core of the Eleventh Circuit's decision was its determination that the claimant in that case, who suffered from bipolar disorder and was responding erratically to

treatment, would be expected to have "good days and bad days," and so the fact that the claimant might have symptom-free intervals could not by itself provide a basis upon which to negate disability. *Id.* at *6.

> As the Eleventh Circuit provided:
>
> Suppose that half the time [the claimant] is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment.

*Id.* at *6. The ALJ in Mace had found it inconsistent for the claimant's treating physician to have found her sometimes to be incapable of learning and performing work tasks but at other times to be able to sustain enough concentration to be able to work for short periods of time. *Id.* The Eleventh Circuit faulted this reasoning because it did not account for "the episodic nature of the alleged mental impairments." *Id.* The Eleventh Circuit also emphasized that the treating physician's opinion carried extra weight in this type of circumstance because of the longevity of his treatment relationship which had placed him in "the best position to give a detailed, longitudinal picture of [the claimant]'s medical impairments and a unique perspective on the medical evidence." *Id.* (internal quotation omitted) (citing 20 C.F.R. § 404.1527(c)(2)). The court also noted that the visit-to-visit treatment notes from the facility where the claimant received therapy reflected that sometimes she was managing her symptoms and her mood was good, while at other times her symptoms exacerbated and she was having mental difficulties. *Id.* at *7.

In the instant case, the ALJ's decision to discount the opinions of Plaintiff's treating sources seems derived from an overemphasis on Plaintiff's "good days" without regard for her "bad days." As Plaintiff's treatment notes reflect, she has had numerous instances during the treatment period when she was overcome by anxiety attacks or unable to get out of bed due to depression. These instances simply are not accounted for in the ALJ's analysis, which only cited to instances or periods where Plaintiff was feeling positive and functional. By contrast, the commentary provided by Dr. Wright-Johnson on the RFC form particularly explained the vacillating patterns in Plaintiff's mental health functioning (Tr. 473), yet neither this commentary nor the pattern itself were addressed by

the ALJ.[5]  Thus, the ALJ's conclusion that the opinions of Drs. Fraser and Wright-Johnson were inconsistent with their treatment notes is untenable.

It bears noting that, in completing the RFC questionnaire forms, the answers provided by both doctors seem to suggest that Plaintiff would be unable *on any given day* to perform consistent work, free of episodes of decompensation or breakdowns in concentration, persistence, and pace. These answers might seem a mirror image of the ALJ's own faulty analysis in that they appear to reflect upon Plaintiff's bad days to the exclusion of the good ones.  However, this appearance seems to be owing to the shortcomings of the checkbox style forms that were used more than anything else, for the forms do not allow for answers that would describe the type of variance in mood and functioning that exists in this case.  It is perhaps in recognition of this fact that Dr. Wright-Johnson chose to provide her additional commentary describing Plaintiff's episodic patterns.

It also bears noting that part of the ALJ's finding of inconsistency in the opinions of Drs. Fraser and Wright-Johnson seems to derive from the notes and impressions from these doctors which 1) nearly always described Plaintiff as neat in appearance, communicative, and able to concentrate during her office visits; and 2) regularly described relationships, activities, or employment (mainly self-employment) pursuits Plaintiff was attempting.  Thus, the ALJ tended to focus upon those treatment notes during times when Plaintiff maintained an overall positive outlook with only mild symptoms.

While these positive factors might rightly hold some sway in the ALJ's analysis, they should only do so after one considers the differences between how a claimant with mental health issues might cope during an office visit or in the home environment versus a competitive workplace.  Here, the court once again draws guidance from the Eleventh Circuit's holding in Mace, which stated:

> [T]he ALJ failed to consider that persons with chronic psychotic mental impairments like [the claimant] "may commonly have [their] li[ves] structured in such a way as to minimize [their] stress and reduce [their] symptoms and signs." 20 C.F.R. § 404, Subpt. P., App. 1, § 12.00(E).  For that reason, such individuals "may be much more impaired for work than [their] symptoms and signs would indicate." *Id.*; *see also* 20 C.F.R. § 404, Subpt. P., App. 1, § 12.00(C)(3) ("We must exercise

---

[5] It is worth noting that, although they are not treating sources, the opinions provided by Dr. Hirschorn and Mark Laufer also recognized the mercurial nature of Plaintiff's bipolar condition, indicating that this would negatively affect her ability to work on a consistent basis (Tr. 372–73, 184).

Case No.: 3:14cv370/LAC/EMT

great care in reaching conclusions about [a claimant's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [a claimant's] ability to complete tasks in other settings that are less demanding, highly structured, or more supportive."); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir.2001) ("With regard to mental disorders, the Commissioner's decision must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." (citation and internal quotation marks omitted)).

Because the ALJ did not account for the effect of the environment on [the claimant], the ALJ found inconsistencies between [the treating physician]'s opinion and the evidence that were largely illusory, often emphasizing the importance of evidence regarding [the claimant]'s signs and symptoms without addressing how her mental impairments would translate to consistent employment in a competitive work environment.

2015 WL 1380168, at *4–5.

As with the ALJ in Mace, the ALJ in the present case did not sufficiently account for the fact that Plaintiff may have been able to function better at home, in less demanding environments such as an exercise class, or in her effort to start her own home business, the terms of which she could structure herself; but she was less able, as her treating sources describe, to maintain a sufficient level of functioning in a traditional employment arrangement.[6]  Likewise, without more, the fact that Plaintiff appeared alert and communicative during her medical visits does not signify that she would be similarly functional in a competitive work environment.  Thus, as per the holding in Mace, it is not apparent to this court how Plaintiff's treatment notes and recorded symptoms during medical office visits were inconsistent with her treating sources' findings that Plaintiff's mental impairments would cause her pronounced difficulties within the context of the stresses of a traditional work environment.

This is not to say that inconsistencies necessarily *cannot* be shown between the opinions of Plaintiff's treating sources and their treatment notes or that the evidence as a whole supported a finding contrary to those opinions such that they may be discounted.  Rather, the court would direct

---

[6] Unfortunately, the record is relatively sparse as it relates to Plaintiff's employment history, the duration of her jobs (some of which were allegedly short-lived), the reasons she left or was terminated, or how well she adapted to the work environments.

that on remand that the Social Security Administration fully consider the stresses of a work environment as well as the fluctuating nature of Plaintiff's alleged disabilities when determining what weight to accord to the opinions of her treating sources and the other evidence in the case.

In conclusion, for the reasons provided above, this case should follow the general rule when errors occur, which is to reverse and remand for additional proceedings. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir. 1991).

Accordingly, it is respectfully **RECOMMENDED**:

1. That the Commissioner's decision denying benefits be **REVERSED**.

2. That this case be **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**DONE AND ORDERED** this 20th day of July 2015.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**